**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Regina Y. Robinson, | : | Case No. 3:11-CV-0063 |
| Plaintiff, | : | |
| v. | : | **M E M O R A N D U M** |
| | | **DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U. S. C. § 1381[1]. Pending are the parties' Briefs on the Merits (Docket Nos. 17 & 22).  For the reasons that follow, the Commissioner's decision is affirmed.

### I. PROCEDURAL BACKGROUND.

On July 20, 2007, Plaintiff applied for SSI, alleging that her disability began on December 1, 2006 (Docket No. 10, Attachment 6, pp. 2-6 of 14).  The request for an award of benefits was

---

[1]       Title XVI of the Act provides for payment of SSI benefits to disabled persons who are indigent.  42 U.S.C. § 1382 *et seq.*

denied initially and upon reconsideration (Docket No. 10, Attachment 5, pp. 5-7, 9-11, 13-15 of 31).

Plaintiff filed a timely request for hearing and on January 15, 2009, Administrative Law Judge (ALJ)

Dennis James LeBlanc held a hearing at which Plaintiff, represented by counsel, and Carol Mosley,

a Vocational Expert (VE), appeared and testified (Docket No. 10, Attachment 3, p. 2 of 32). The

ALJ rendered an unfavorable decision denying an application for a period of SSI on February 13,

2009 (Docket No. 10, Attachment 2, pp. 13-25 of 25). On December 6, 2010, the Appeals Council

denied Plaintiff's request for review (Docket No. 10, Attachment 2, pp. 7-9 of 25). On January 10,

2011, the Appeals Council set aside its earlier action to consider additional information and after

doing so denied Plaintiff's request for review[2] (Docket No. 10, Attachment 2, pp. 2-4 of 25).

Plaintiff filed a timely Complaint in this Court seeking judicial review (Docket No. 1).

## II. FACTUAL BACKGROUND.

### A.   PLAINTIFF'S TESTIMONY.

Plaintiff, a high school graduate, was 36 years of age. She resided at a crisis shelter.

Plaintiff's three children resided with her father.

Plaintiff recalled that during the past fifteen years she had not worked in any capacity other

than cleaning tables at a restaurant (Docket No. 10, Attachment 3, pp. 8, 18 of 32). Plaintiff did not

quit work; she was laid off in 2006 with the expectation that she would be recalled.

When her fiancé died suddenly, Plaintiff lost her ability to concentrate, remember or focus.

She became irritable without provocation and prone to racing thoughts and indecisiveness. Her

physician claimed that her physical pain was a symptom of depression (Docket No. 10, Attachment

---

[2] On December 6, 2010, the Appeals Council received additional information for treatment Plaintiff received at the Kentucky River Community Care Center from May 11, 2010 through June 30, 2010 (Docket No. 10, Attachment 2, pp. 10, 11 of 25).

3, p. 10 of 32).

Plaintiff had difficulty getting out of the bed at least five days weekly.  In fact, she generally slept fifteen of twenty-four hours.  Her oldest daughter assisted with bathing and dressing Plaintiff. Once she was dressed, Plaintiff generally returned to bed (Docket No. 10, Attachment 3, pp. 11, 12, 14 of 32).  Plaintiff explained that she had no interest in reading or watching television.  The only person she saw consistently was her father.  Although she had panic attacks when exposed to crowds, Plaintiff attended church occasionally.  Plaintiff left the house only to purchase cigarettes when she was unable to coax her nephew to go to the store on her behalf.

Generally, Plaintiff was prescribed medication for treatment of hypertension and depression. Specifically, she took a combination of medications that controlled her blood pressure and antidepresssants and an antipsychotic medication used in conjunction with each other to treat the symptoms of depression (Docket No. 10, Attachment 3, pp. 13, 14, 20, 23, 24 of 32).  The side effects of this medication included excessive sleepiness (Docket No. 10, Attachment 3, p. 14 of 32).

**B.    VE'S TESTIMONY.**

The VE reviewed the work history and characterized Plaintiff's past work as a dining room attendant.  Such work was considered light and unskilled.  The work had a specific vocational preparation (SVP) of two.  Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DICTIONARY OF OCCUPATIONAL TITLES (DOT), 1991 WL 688702 (4th ed. Rev. 1991).  The level time of two denotes anything beyond a short demonstration up to and including one month (Docket No. 10, Attachment 3, pp. 28-29 of 32).

3

The ALJ asked that the VE further assume a hypothetical plaintiff, able to perform a full range of exertional work, except that the hypothetical plaintiff was limited to: (1) understanding, remembering and carrying out simple instructions only; (2) performing repetitive tasks and no production quotas; (3) conduction superficial interaction with co-workers; (4) superficial interaction with supervisors; and (5) no direct interaction with or dealing with the general public. The VE opined that under these terms, the hypothetical plaintiff could perform Plaintiff's past relevant work. Coincidentally, there were three representative samples of jobs requiring a SVP of two that were available in significant numbers that Plaintiff could perform:

| Job | Dot Number | Statewide Availability | Nationwide Availability |
|---|---|---|---|
| Cleaner | 323.687-018 | 3,500 | 500,000+ |
| Packer | 920.587-018 | 4,000 | 500,000+ |
| Building Cleaner | 323.687.010 | 4,500 | 600,000+ |

(Docket No. 10, Attachment 3, p. 30 of 32).

Assuming that because of depression, the hypothetical plaintiff had a moderate to marked limitation in the ability to handle the stress of work such that they would be off task at least 20% of the time, the jobs–cleaner, packer, building cleaner–would not exist and there would not be any jobs at a competitive level that Plaintiff could perform (Docket No. 10, Attachment 3, p. 31 of 32).

### III. SUMMARY OF MEDICAL EVIDENCE.

Medical evidence is the cornerstone for the determination of a disability. A summation of Plaintiff's mental and physical medical evaluations follows.

### A. MENTAL IMPAIRMENT EVIDENCE.

Approximately two days after Plaintiff suffered a miscarriage, she completed a medication

somatic/psychiatric evaluation at the Murtis H. Taylor Multi-Service Center, a mental health care service provider.  On June 20, 2007, Plaintiff was diagnosed with post traumatic stress disorder, hypertension and a global assessment of functioning (GAF) score of 35.   GAF considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness; it does not include impairment in functioning due to physical (or environmental) limitations.  A score of 35 indicated that in the opinion of the mental health clinician, Plaintiff's behavior was considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends) (Docket No. 10, Attachment 10, pp. 2-5 of 28;  www.murtistaylor.org; www. Global_Assessment_of_Functioning).

On July 8, 2007, Plaintiff presented to the St. Vincent Charity Hospital in Cleveland, Ohio with thoughts of suicide.  Dr. Syed Irfan Ahmed recognized that Plaintiff was depressed and that she had overindulged in smoking drugs for a period of three days beginning on Independence Day.  The toxicology report was positive for cocaine and cannabinoids and results from the metabolic panel showed elevated levels of creatinine and elevated red blood cell distribution.  When discharged, Plaintiff denied any current suicidal/homicidal ideations and audio/visual hallucinations.  Dr. Ahmed prescribed Lexapro, an antidepressant, and recommended that Plaintiff follow up with community mental health professional and chemical dependency treatment (Docket No. 10, Attachment 9, pp. 3-18 of 24; www.nlm.nih.gov; PHYSICIAN'S DESK REFERENCE, 2006 WL 368897 (2006).

Plaintiff was diagnosed with and/or treated for symptoms related to major depression on July 6, 2007, August 10, 2007, August 27, 2007 (Docket No. 10, Attachment 10, pp. 7, 8 of 28).

Dr. Katherine Lewis, Psy. D., completed a PSYCHIATRIC REVIEW TECHNIQUE form on September 26, 2007, in which she based her medical opinion on the presence of affective, anxiety-related and substance-addiction disorders.  Plaintiff's affective disorder was characterized by loss of pleasure from activities usually found pleasurable (anhedonia), sleep disturbance, decreased energy, suicidal ideations and hallucinations.  The presence of anxiety arose from recurrent and intrusive recollections of a traumatic experience that was a source of marked distress and behavioral changes or physical changes arose with the regular use of substances that affected the central nervous system (Docket No. 10, Attachment 10, pp. 12-21 of 28).  The following functional limitations existed as a result of Plaintiff's mental disorders:

| | | |
|---|---|---|
| 1. | Restriction of activities of daily living: | Moderate degree of limitation |
| 2. | Difficulties in maintaining social functioning: | Moderate degree of limitation |
| 3. | Difficulties in maintaining concentration, persistence or pace: | Moderate degree of limitation |
| 4. | Episodes of decompensation, each of extended duration: | None |

(Docket No. 10, Attachment 10, p. 22 of 28).

Plaintiff underwent a series of medication reviews.  First, on October 1, 2007, she reported not sleeping for fear that she would have nightmares.  Treatment included advice to obtain counseling and to "restart" Seroquel, a long-acting tablet used to treat symptoms of schizophrenia, loss of interest in life and strong or inappropriate emotions (Docket No. 10, Attachment 10, p. 28 of 28; PHYSICIAN DESK REFERENCE, 2006 WL 355324 (2006).

Second, on October 29, 2007, Plaintiff reported although she was "groggy" when she took 300 mg of Seroquel,  the medication stabilized her moods (Docket No. 10, Attachment 10, p. 27 of 28).

Third, on November 16, 2007, Plaintiff continued to grieve over the loss of her fiancé and she reported sleeping only three hours at a time.  Plaintiff did not share as much of her problems with others as she did in the past, she was crying less and her appetite was fair (Docket No. 10, Attachment 10, p. 26 of 28).

Plaintiff began having panic attacks when she was persuaded that her fiancé, who died in the prior year, was attempting to kill her.  On December 19, 2007, Plaintiff underwent a mental health assessment and the examiner diagnosed Plaintiff with a depressive disorder, not otherwise specified, with reports of hallucinations and a GAF of 21-30.  A GAF in the range of 21 to 30 denotes behavior that was considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or the inability to function in almost all areas (ex: stays in bed all day, no job, no home, no friends) (Docket No. 10, Attachment 11, pp. 29, 32 of 36).

Later on December 19, 2007, Plaintiff attempted to commit suicide by taking a combination of antidepresssants and Tylenol® PM prior to going to bed.  When the attempt failed, Plaintiff was overwhelmed with the thought of suicide (Docket No. 10, Attachment 11, p. 36 of 36).   On December 20, 2007, Plaintiff superficially cut her wrist and returned to the hospital verbalizing suicidal ideations.  She was diagnosed with a depressive disorder and borderline personality disorder (Docket No. 10, Attachment 12, 8 of 34).  The combination of antidepresssants –Prozac, Seroquel and Trazodone–were used to stabilize her mood (Docket No. 10, Attachment 12, p. 18 of 34).  Plaintiff was discharged with instructions to follow up with a mental health center and chemical dependency clinic (Docket No. 10, Attachment 12, p. 27 of 34).

Dr. Sally Felker, Ph. D., a psychologist, conducted a clinical examination on May 8, 2008, and she opined that Plaintiff showed a primary diagnosis of depression, unspecified type and that

she had a functional GAF of 47, a score that indicated that Plaintiff had serious symptoms (ex: suicidal ideation, severe obsessive rituals) or any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job).  Dr. Felker suggested that Plaintiff had the ability to:

| | | |
|---|---|---|
| 1. | Concentrate and attend to tasks | Mild to possibly moderate impairment. |
| 2. | Understand and follow instructions for one and two-step tasks | No impairment. |
| 3. | Relate to others and deal with the general public | Mild to moderate impairment. |
| 4. | Relate to work peers, supervisors and tolerate the stressors of employment | Moderate to possibly marked impairment due to depression. |

(Docket No. 10, Attachment 12, pp. 31-34 of 34).

On May 21, 2008, Dr. Alice Chambly, Psy. D., completed a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFCA) form and a PSYCHIATRIC REVIEW TECHNIQUE (PRT) form.  In the MRFCA, Dr. Chambly opined that Plaintiff was moderately limited in her ability to:

1. Understand and remember detailed instructions.
2. Carry out detailed instructions.
3. Maintain attention and concentration for extended periods.
4. Work in coordination with or proximity to others without being distracted by them.
5. Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
6. Interact appropriately with the general public.
7. Accept instructions and respond appropriately to criticism from supervisors.
8. Get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
9. Maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
10. Respond appropriately to changes in the work setting.
11. Set realistic goals or make plans independently of others.

(Docket No. 10, Attachment 13, pp. 3-4 of 20).

In the PRT, Dr. Chambly determined that medically determinable impairments were present, namely, major depression and polysubstance abuse.  The degree of limitations that existed as a result of Plaintiff's functional limitations was:

8

| 1 | Restriction of Activities of Daily Living | Mild degree of limitation: |
| 2 | Difficulties in maintaining social functioning | Moderate degree of limitation: |
| 3 | Difficulties in maintaining concentration persistence and pace | Moderate degree of limitation. |
| 4 | Episodes of decompensation | There were no episodes of decompensation of extended duration. |

(Docket No. 10, Attachment 13, p. 17 of 20).

From March 25, 2008 through December 15, 2008, Plaintiff obtained drug therapy and supportive psychotherapy from the Mental Health Services (MHS). At MHS, Dr. Susan Padrino, an internist and specialist in psychosomatic medicine and psychiatry, supplemented the therapy regimen with Wellbutrin®, a medication used to treat depression, a sleep aid and an increased dosage of Abilify, a medication used to treat the symptoms of schizophrenia (Docket No. 10, Attachment 14, pp. 9-11 of 30; PHYSICIAN'S DESK REFERENCE, 2006 WL 372108 (2006); www.vitals.com/doctors/Dr_Susan_Padrino.html; www.nlm.nih.gov).

Plaintiff commenced treatment on September 25, 2008 with MHS Psychiatrist Dr. J. Chud, who diagnosed Plaintiff with a Bipolar II Disorder, an affective disorder characterized by the occurrence of intense elevated moods that never reach full mania. Dr. Chud provided supportive psychotherapy and monitored Plaintiff's use of medications prescribed to affect her behavior or perception (Docket No. 10, Attachment 14, pp. 2-7, 9, 11, 13, 16 of 30; www.webmd.com/bipolar-disorder/guide/bipolar-2-disorder).

Plaintiff, through the Kentucky River Community Care Center, a mental health facility, entered a comprehensive treatment plan that was effective from May 11, 2010 through June 30, 2010. She made monthly contact so that her medication intake and its effect on her mood and affect could be monitored. Plaintiff reported generally that she was doing well (Docket No. 10, Attachment 16, pp. 4-14 of 14; www.krccnet.com).

On October 19, 2010, Plaintiff presented to South Pointe Hospital, a Cleveland Clinic Hospital, asserting that she had suicidal thoughts.  Dr. Mark J. Zedar, D.O., a psychiatrist, treated Plaintiff for a schizoaffective disorder, a chronic mental illness that causes both a loss of contact with reality (psychosis) and mood problems, by supplementing Plaintiff's drug therapy with an increased dose of Seroquel, a medication used to relieve anxiety, as needed (Docket No. 10, Attachment 17, pp. 3-4, 6, 15, 20, 23-25 of 31; www.healthgrades.com/physician/dr-mark-zedar; www.nlm.nih.gov).

On October 21, 2010, Dr. Rajesh Agarwal, M. D., a general internal medicine physician, monitored Plaintiff's white blood count, blood sugar, blood urea nitrogen, creatinine levels, cholesterol and thyroid-stimulating hormone levels.  Plaintiff's blood pressure was stable and she tolerated the Seroquel well.  Dr. Agarwal noted that the toxicology report was positive for opiates and benzodiazepines, a class of compounds with antianxiety, hypnotic, anticonvulsant, and skeletal muscle relaxant properties (Docket No. 10, Attachment 17, pp. 12-13, 16, 18 of 31; STEDMAN'S MEDICAL DICTIONARY 46200 (27th ed. 2000); www.healthgrades.com/physician/dr-rajesh-agarwal).

Dr. Zedar opined on October 22, 2010 that Plaintiff had a GAF of 30 or she exhibited behavior that was considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas (ex: stays in bed all day, no job, no home, no friends) (Docket No. 10, Attachment 17, p. 15 of 31).

On November 8, 2010, Dr. Zedar reviewed the diagnostic data and determined that Plaintiff's complete blood count was within normal limits.  Her urine toxicology screen was presumptively positive for opiates and benzodiazepines (Docket No. 10, Attachment 17, pp. 30-31 of 31).

**B.**     **TREATMENT FOR PHYSICAL IMPAIRMENTS.**

On January 6, 2005, Dr. Amy Miller, M.D., a family medicine practitioner at the University Hospital of Cleveland, noted that there were multiple episodes of inflammation of recurring cysts near or on the natal cleft of the buttocks.  Plaintiff was referred for surgery (Docket No. 10, Attachment 9, p. 24 of 24; http://enwikipedia.org.wiki/Pilonidal_cyst).

Plaintiff underwent a physical health screen on June 20, 2007.  She denied that she was stricken with respiratory, gastrointestinal, neurological or musculoskeletal disorders.  Plaintiff reported that she had difficulty sleeping for more than two to four hours at a time (Docket No. 10, Attachment 10, p. 6 of 28).

On August 9, 2007, Plaintiff presented to the Family Medicine Center at the University Hospital in Cleveland to undergo the Papanicolaou (Pap) test, a screening test used to detect pre-cancerous and cancerous cells in the endocervical canal, and address her "itching feet."  Plaintiff described the presence of audible hallucinations and expressed feelings of paranoia.  She was referred to a counselor and case manager (Docket No. 10, Attachment 9, p. 20 of 24; women.webmd.com/pap-test).

On August 27, 2007, Plaintiff reported that she continued to have difficulty getting to sleep but she was able to sleep better (Docket No. 10, Attachment 10, p. 7 of 28).

Apparently Plaintiff stopped taking medication prescribed for control of her blood pressure in 2002.  Plaintiff presented to the emergency room on August 28, 2007 with an elevated blood pressure.  She was prescribed medication used to control blood pressure (Docket No. 10, Attachment 11, p. 6 of 36).

Plaintiff was treated for tooth pain on September 16, 2007.  An antibiotic and pain reliever

11

were prescribed (Docket No. 10, Attachment 11, pp. 15-19 of 36).

Plaintiff underwent medical treatment for a headache on December 18, 2007 (Docket No. 10, Attachment 11, pp. 23-24 of 36).

Results from the electrocardiogram administered on December 19, 2007 were normal (Docket No. 10, Attachment 11, p. 2 of 36).  Plaintiff's red blood cell distribution width and mean platelet volumes were elevated (Docket No. 10, Attachment 12, p. 3 of 34).  The toxicology screen showed the presence of an active ingredient in cannabis (Docket No. 10, Attachment 12, p. 6 of 34).

Plaintiff presented to Care Alliance Health Center, a nonprofit community health center, on December 31, 2007 to undergo a pregnancy test.  Plaintiff underwent a series of contraceptive injections (Docket No. 10, Attachment 15, pp. 10, 14, 15, 17, 33 of 33; www.carealliance.org).

On January 31, 2008, Plaintiff was treated for an elevated blood pressure (Docket No. 10, Attachment 15, p. 29 of 33).  On April 14, 2008, Plaintiff's presented with a "hypertensive urgency" so medication used to reduce the level of blood pressure was immediately dispensed (Docket No. 10, Attachment 15, pp. 27-28 of 33).  Plaintiff's hypertension was not well controlled on July 1, 2008 but it was well controlled on October 30, 2008 (Docket No. 10, Attachment 15, pp. 15, 20 of 33).

Plaintiff underwent emergency treatment for a headache and dizziness on July 22, 2008.  A radiological examination to study the cause of chest pain was engaged.  The radiological evidence showed clear lungs and a heart of normal size (Docket No. 10, Attachment 15, pp. 4-8, 9 of 33).

### IV.  STANDARD FOR DISABILITY.

Eligibility for DIB and SSI is predicated on the existence of a disability.  *Martinez v. Commissioner of Social Security*, 692 F. Supp.2d 822, 825 (N. D. Ohio 2010) (*citing* 42 U.S.C. §§

423(a), (d)).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in DIB context); *see also* 20 C. F. R. § 416.905(a) (definition used in SSI context)).  The Commissioner's regulations governing the five-step evaluation of disability for DIB and SSI are identical for the purposes of this case, and are found at 20 C. F. R. §§ 404.1520 and 416.920, respectively:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four.  *Id.* (*citing Walters*, 127 F.3d 525, 529 (6th Cir. 1997)).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.*  The court considers claimant's residual functional capacity, age, education, and past work experience to determine if claimant could perform other work.  *Id.* (*citing Walters*, 127 F.3d at 529)  Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he or she determined to be disabled.  *Id.* (*citing* 20 C. F. R. § 404.1520(b)-(f); *see also Walters*, 127 F. 3d at 529).

13

## V.  THE ALJ'S FINDINGS

On February 13, 2009, the ALJ applied the governing five step analyses and determined that Plaintiff was not disabled.  Upon consideration of the evidence, the ALJ made the following findings:

At step one, the ALJ found that Plaintiff had not engaged in substantial work activity as defined at 20 C. F. R. § 416.972, since July 20, 2007, the application date.

At step two, the ALJ found that Plaintiff had the following severe impairments:  major depressive disorder and post traumatic stress disorder.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§ 416.925 and 416.926).

At step four, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: understanding, remembering, carrying out simple instructions, performing repetitive tasks, no production quotas such as assembly line jobs, superficial interaction with co-workers and supervisors and no direct dealing or interaction with the public.

At step five, the ALJ found that Plaintiff was 34 years of age, a younger individual age 18-44, with at least a high school education and the ability to communicate in English.  Considering her age, work experience and residual functional capacity, there were jobs in significant numbers in the national economy that Plaintiff could perform.

The ALJ concluded that Plaintiff was not under a disability since July 20, 2007, the date the

14

application was filed (Docket No. 10, Attachment 2, pp. 13-25 of 25).


## VI.  STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)).  The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as

adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VII. DISCUSSION

In the Brief, Plaintiff identifies three alleged errors in the ALJ's decision. First, the ALJ erred by failing to consider certain psychological limitations in assessing residual functional capacity. Second, the ALJ failed to give reasons for discounting Dr. Felker's opinion. Third, the ALJ failed to give any reason for not mentioning Ms. Benjamin's report.

Defendant replied that substantial evidence supported the ALJ's determination that Plaintiff was not disabled. Defendant contends that Plaintiff's request for benefits does not compel a finding of disability under the regulations.

### 1. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ's residual functional capacity findings do not take into consideration that Dr. Felker opined that due to her depression, her ability to tolerate stressors of employment was **possibly** markedly impaired or that she was poorly motivated, made poor decisions, was easily detracted, self isolated and needed reminders to maintain her personal care.

The ultimate responsibility for determining a claimant's residual functional capacity rests with the ALJ and that determination is based upon the evaluation of the medical evidence and the

16

claimant's testimony. *Sutherland v. Astrue*, 2011 WL 3862100, *5 (N. D. Ohio 2011) (*citing* 42 U.S.C. § 423(d)(5)(B); *Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004)). Residual functional capacity is a measurement of the most a claimant can do despite his or her limitations. *See* 20 C.F.R. § 416.945(a) (Thomson Reuters 2011). Residual functional capacity is to be determined by the ALJ only after he or she considers all relevant evidence of a claimant's impairments and any related symptoms ( e.g., pain). See 20 C.F.R. § 416.929(a) (Thomson Reuters 2011).

None of the treating sources in this case produced a residual functional capacity opinion. The only such opinions in the record consist of evaluations done by the state agency physicians and psychologists. The ALJ reviewed Plaintiff's medical evidence, impairments, physical and mental limitations, symptoms, daily activities, and credibility, and from the entire record, the ALJ concluded that although Plaintiff had a major depressive disorder and post-traumatic stress disorder, Plaintiff had the residual functional capacity to perform work at all exertional levels. The ALJ adopted the definitive opinions of the state agency psychologists and identified Plaintiff's functional limitations. Then the ALJ made a single finding integrating all of Plaintiff's restrictions in the functional areas. The ALJ properly determined Plaintiff's residual functional capacity in relation to her limitations not based on what she could do **if** her limitations were significantly more impaired.

Plaintiff also asserts that the ALJ failed to consider that her mental impairment was impeded by her lack of motivation, poor decision-making tools, easy detractions, self isolation and the need for reminders to tend to her own personal care

When assessing the severity of an individual's mental impairment, the ALJ's written decision must include findings based upon a "special technique." *Yoakem v. Commissioenr of Social*

17

*Security*, 2011 WL 5870827, *3 (S. D. Ohio 2011) (*citing* 20 C. F. R. §§ 404.1520a and 416.920a). This special technique is a series of steps delineated in subsections (b) through (e) of 20 C.F.R. §§ 404.1520a and 416.920a that requires a rating of degree of functional loss resulting from impairment.  *Id.*  A plaintiff's level of functional limitation is rated in four areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation also referred to as the "B" criteria.  *Id.* (*see Hogg v. Sullivan*, 987 F.2d 328, 332 (6ᵗʰ Cir. 1993) (per curiam)).  The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: None, mild, moderate, marked, and extreme.  *Id.*  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale:  None, one or two, three, four or more.  *Id.*  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.  *Id.* (*citing* 20 C.F.R. § 404.1520a(c)(4)).  Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe.  *Id.* (*citing* 20 C.F.R. § 404.1520a(d)(1)).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder.  *Id.* at *4.  If it does not, the Commissioner must then assess plaintiff's mental residual functional capacity.  *Id.*  The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment.  *Id.* (*see* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c)).

The conclusions that Plaintiff had no motivation, made poor decisions, detracted easily, was

18

self isolated and needed reminders for personal care are more appropriately identified as criteria used to rate the functional limitations as well as the severity of the mental impairment at steps two and three of the sequential evaluation process. These limitations are not applicable to the assessment of residual functional capacity assessment as they do not assess what Plaintiff can do despite her limitations. The ALJ did not err by failing to consider these needs in assessing residual functional capacity.

### 2. DR. FELKER'S ASSESSMENT.

Dr. Felker conducted a single examination on May 8, 2008. Plaintiff contends that the ALJ failed to give adequate reasons for discounting Dr. Felker's opinion that due to her depression, Plaintiff had a moderate to possibly marked impairment in tolerating the stressors of employment which adversely affected residual functional capacity.

Social Security Administration gives the most weight to opinions from a claimant's treating source; accordingly, an ALJ is procedurally required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 514 (6th Cir. 2010). However, this requirement only applies to treating sources. *Id.* (*citing Smith v. Commissioner of Social Security*, 482 F. 3d 873, 876 (6th Cir. 2007)). With regard to nontreating, but examining, sources, the agency will simply "[g]enerally [ ] give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined" him. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(1); *see also Smith,* 482 F.3d at 875).

The ALJ acknowledges his obligation to give due consideration to the opinions of the consultative examiner who actually examined Plaintiff. In keeping with this concept, the ALJ

articulated clear and convincing reasons for adopting Dr. Felker's conclusions to the extent that they were supported by probative evidence in the record.  The ALJ was not required to articulate good reasons for rejecting the portions of Dr. Felker's medical opinion that were speculative and not supported by substantial evidence.  The undersigned finds that the ALJ's decision to place more weight on the conclusions of the consultative source is appropriate under the rules and it is supported by substantial evidence.

### 3. MS. BENJAMIN.

On August 9, 2007, JoAnna Benjamin, a case manager, provided a third-party witness statement regarding her observations of Plaintiff's functional limitations on a form entitled FUNCTION REPORT ADULT THIRD PARTY (Docket No. 10, Attachment 7, pp. 22-29 of 49).  Plaintiff alleges that the ALJ erred by failing to mention Ms. Benjamin's report in his decision.

The Social Security Regulations and Rulings allow for the consideration of evidence from "non-medical sources," to show the severity of a claimant's impairments and how they affect the claimant's ability to work.  20 C.F. R. §§ 416.913(d) (4) (Thomson Reuters 2011); TITLES II AND XVI: II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL AND NONGOVERNMENTAL AGENCIES, SSR 06-3p, 2006 WL 2329939 (August 9, 2006).  Specifically, "we may use evidence from "other sources," as defined in 20 C.F.R. §§ 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-3p at *2.  Information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.  *Id.*  Although there is a distinction between what an

20

adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally **shoul**d explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.  *Id.*

The Magistrate finds that there is no controlling precedent requiring an ALJ to explicitly address written statements such as the Function Report.  However, there is a requirement that the Commissioner consider all relevant evidence in an individual's case record.  The ALJ **should** have mentioned that he considered the opinions from non-medical sources such as a case manager who had seen Plaintiff in her professional capacity.  The failure to mention the report, however, is harmless error.

Ms. Benjamin averred on the Function Report that she counseled Plaintiff for a period of six months that immediately preceded the onset of Plaintiff's alleged disability on July 20, 2007. There are no notes from these counseling sessions.  It is evident that Ms. Benjamin's opinions in the Function Report are based in large part on the subjective statements of Plaintiff that were no longer relevant.  For instance, Ms. Benjamin described Plaintiff's daily activities from the time she woke up until going to bed as including watching television, listening to radio, playing with children and talking to family (Docket No. 10, Attachment 7, p. 22 of 49).  At the hearing, Plaintiff claimed that she had lost interest in all of these activities.  During the six months of counseling, Plaintiff was residing with her sister and her children.  Plaintiff's sister was the caretaker of her children.  At the time of the hearing, Plaintiff was homeless and her children were in the custody of her father not her sister.  Plaintiff explained to Ms. Benjamin that she was unable to sleep more than three hours.  At

the time of the hearing, Plaintiff was sleeping fifteen hours per day.  Ms. Benjamin reported that Plaintiff needed reminders to take care of her personal hygiene.  In fact, her daughter provided those daily reminders and prepared her meals.  At the time of the hearing, Plaintiff's daughter continued to feed her mother and remind Plaintiff to take care of her personal hygiene.  Ms. Benjamin had little special knowledge or insight into the severity of Plaintiff's impairments that could not be determined from Plaintiff's testimony.  Neither did her responses on the form offer any insight into how Plaintiff's impairments affected her ability to function.  Remand for the sole consideration of the subjective opinions on the Form will not alter the ALJ's decision.

## VIII.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:    January 20, 2012